IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES EUGENE KEISER,        *

      Petitioner,          *

v.                         *          Civil Action No. GLR-17-1240

WARDEN RICKY FOXWELL, et al.,  *

      Respondents.      *
                             *****

## MEMORANDUM OPINION

THIS MATTER is before the Court is Petitioner James Eugene Keiser's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1). The Petition is ripe for disposition, and no hearing is necessary. See Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts and Local Rule 105.6 (D.Md. 2018); see also Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons stated below, the Court will deny the Petition and decline to issue a certificate of appealability.

## I.      BACKGROUND

### A.   **Trial**

In October 2010, Keiser was tried in the Circuit Court for Washington County, Maryland. (Resp'ts.' Ans. Pet. Writ Habeas Corpus ["Resp'ts.' Ans."] Ex. 3, ECF No. 3-3). Keiser was charged with two counts: solicitation to commit first-degree murder; and solicitation to commit first-degree assault. (Petr.'s Mem. L. & Facts Supp. Pet. at 2

["Pet."], ECF No. 1-1). A jury convicted Keiser of both counts. (Resp'ts.' Ans. Ex. 6 at 1, ECF No. 3-6). The evidence and testimony presented at trial are outlined below.

Trial commenced on October 4, 2010. (Resp'ts.' Ans. Ex. 3 at 1). Keiser was wearing a shirt that said "DOC[1] - on the back of it." (Id. at 8). During voir dire, the judge called defense counsel, Carl Creeden, and Keiser to the bench to address Keiser's shirt. (Id.). The judge inquired whether Creeden objected to Keiser wearing the shirt. (Id.). Creeden responded that the fact that Keiser was detained would "probably come out anyway" and that when Keiser testified Creeden would "cover that." (Id.). Creeden also indicated that he did not object to Keiser wearing the shirt and that, while he understood the judge's concern, the issue was "not as prejudicial as it would be in some cases." (Id. at 8–9).

During his opening statement, Creeden explained that Keiser was arrested on December 16, 2009, for a violation of a protective order and for second-degree assault. (Id. at 42). When the prosecutor objected to the statement, Creeden stated that he was explaining to the jury why Keiser was in DOC clothing. (Id. at 42–43).

The State's first witness was Deputy First Class Rick Whittington of the Washington County Sheriff's Department. (Id. at 47). He testified that on December 16, 2009, he was assigned to the domestic violence unit and served Keiser with an arrest warrant and protective order. (Id. at 47–48). While Whittington was transporting Keiser to the Sheriff's Department, Keiser asked who got the protective order. (Id. at 49). When Whittington responded that Keiser's wife had gotten the order and that he would go over

---

[1] "DOC" is the acronym for "Department of Correction."

it once they arrived at the Sheriff's Department, Keiser said, "it don't matter; um, you don't have to go over anything, no piece of paper is going to stop me from getting that bitch." (Id.). Whittington further testified that while processing Keiser, he asked Keiser if he had any firearms. (Id. at 50). Keiser asked whether a nail gun was considered a firearm. (Id.). When Whittington responded in the negative, Keiser replied, "good, I can put a nail in the bitch's head." (Id.). Whittington testified that he conveyed Keiser's statements to the commissioner for use in setting bond, to the warrant officer, and to his partner. (Id. at 61). During cross-examination, Whittington explained that he did not write a formal report regarding Keiser's statements until over a month later when Detective Gregory Alton ("Detective Alton") advised him that Keiser was being charged with solicitation. (Id. at 10, 52–53).

Next, the State called Tyrone Smith to testify. Smith had been detained with Keiser in the Washington County Detention Center. (Id. at 65–67). Smith admitted to his lengthy criminal record. (Id. at 61–64, 84–96). He also discussed the amount of time he was facing for new charges against him as well as violations of probation for other charges in several jurisdictions. (Id. at 61–64, 84–96). He agreed that he had no charges pending in Washington County and that the State's Attorney for Washington County had not made any promises to in exchange for Smith's testimony. (Id. at 63). Smith admitted that the State's Attorney for Washington County did offer to make a phone call on his behalf to the State's Attorney for Carroll County to relay Smith's cooperation in Keiser's case. (Id. at 64).

Smith testified that from December 2009 to January 2010, he was detained at the Washington County Detention Center (the "Detention Center"), where he met Keiser. (Id. at 65–66). Smith recalled that he started speaking to Keiser when he learned they were from the same area and had attended the same high school. (Id. at 67). Smith indicated that he did not know, nor did he recognize Keiser from growing up in the same area. (Id.). He further testified that he had not met any members of Keiser's family and that they did not have any friends in common, but knew some of the same people from the area. (Id.).

Smith testified that around Christmas 2009, Keiser returned to the Detention Center "in a huff and a tizzy over the results of" the protective order hearing. (Id. at 70). At that time, Keiser solicited Smith to murder his wife, Shirley N. Keiser. (Id. at 71). Keiser told Smith that he wanted Smith to kill his wife because "everything that had gone wrong in his life was her fault." (Id.). He told Smith that he "took his wedding vows seriously" and the only way the marriage would end would be through death. (Id. at 71–72). Keiser offered Smith $15,000.00 to kill his wife and indicated that he would make arrangements through a family they both knew from the town they grew up in for payment of the money. (Id. at 72). Smith testified that at first he thought Keiser was angry and depressed and did not make much of Keiser saying that he was going to kill his wife. (Id. at 73–74). He took Keiser more seriously after Keiser returned from the protective order hearing and expressed to Smith that he learned that an organization that assisted abused women was helping his wife. (Id. at 74–75). At that point, Keiser offered Smith money to kill his wife. (Id. at 70). Keiser did not specify how he wanted his wife

killed but gave examples such as using a cross bow. (<u>Id.</u> at 80). Keiser also did not specify where his wife was to be killed but left that up to Smith. (<u>Id.</u> at 75). He told Smith where his wife worked, the type of vehicle she drove, her physical description, the general location of their house, as well as the override code to their home alarm system. (<u>Id.</u> at 75–77). Smith reported this information to the shift commander at the Detention Center, who relayed it to the Sheriff's Department. (<u>Id.</u> at 77–78). A few days later, Detective Alton interviewed Smith. (<u>Id</u>. at 78).

Detective Alton was the lead investigator on Keiser's case. (<u>Id.</u> at 113). He interviewed Smith and asked him to wear a wire; Smith refused. (<u>Id.</u> at 113–14). Detective Alton confirmed information Smith gave him regarding the description of Keiser's house, its location, and the type of car Keiser's wife drove. (<u>Id.</u> at 116–17). Detective Alton confirmed that Keiser's wife and Smith did not know each other. (<u>Id.</u> at 117). He also contacted Whittington regarding the statements Keiser made to Whittington to request that he write a report on the statements. (<u>Id.</u> at 118).

It was also adduced at trial that Keiser wrote to his wife on January 26, 2010, directing her to "sign a blank check from my account to be given to [his childhood friend] when asked for." (<u>Id.</u> at 120–21, 131).

Keiser's wife testified at the trial. She confirmed her place of employment, the override code for her house alarm, the description of her home, and the type of car that she drove, as Smith described. (<u>Id.</u> at 128). Keiser's childhood friend testified and denied that Keiser contacted him regarding delivering money to anyone. (<u>Id.</u> at 137–38).

Keiser called Russell Harris who was also incarcerated at the Detention Center with him. (Id. at 141–42). He was on the same pod as Keiser and Smith and testified that Keiser never discussed with him having his wife killed. (Id. at 142). He further testified that Smith did not tell him that Keiser had solicited him to kill his wife. (Id. at 142–43). Smith told Harris that "he wanted to get [ ] Keiser" that he wanted "to send him to prison." (Id. at 144). Harris believed Keiser and Smith had argued about something but offered no specifics. (Id.).

Keiser testified on direct that he was presently incarcerated at the Jessup Correctional Institution ("JCI"), with a projected release date in early 2011, and that the charge against him for violating the protective order remained pending. (Id. at 151–52). Keiser was incarcerated as a result of his arrest on December 16, 2009, but his conviction was not final yet because it was under appeal. See Keiser v. State, No. 1495, Sept. Term 2010 (Md.Ct.Spec.App. July 27, 2012). Creeden also impeached Keiser with a conviction from January 2, 1994, for escape from home detention. (Id. at 153). His attorney stated, "The escape is actually listed as January 2, 1994, which is over fifteen years ago, but we'll talk about it anyway. Does that sound right, Mr. Keiser." (Id. at 154). Keiser agreed that this was correct. (Id.). Creeden then elicited that Keiser had been convicted of misdemeanor theft fifteen years ago. (Id.). Keiser indicated he did not recall that conviction but he did not dispute it. (Id.).

Keiser denied soliciting Smith to kill his wife. (Id. at 155). He testified that on the day Whittington arrested him, he had been drinking all day and did not remember making the statements threatening his wife that Whittington attributed to him. (Id. at 156). He

explained that he wrote to his wife asking that she sign the blank check over to his childhood friend because he needed money in his jail account and because he wanted his friend to take over his checking account. (Id. at 158). Keiser explained that the details Smith knew about his wife, their house, her employment, her vehicle, and the alarm code, were all gleaned from innocent conversations they had while incarcerated together. (Id. at 159–63).

The jury returned guilty verdicts on both charges. (Id. at 214). Keiser was sentenced to life imprisonment with all but thirty years suspended for solicitation to commit first-degree murder and a concurrent twenty-five year term of imprisonment for solicitation to commit first-degree assault. (Resp'ts.' Ans. Ex. 4 at 5–6, ECF No. 3-4).

## B.    Direct Appeal[2]

On appeal to the Maryland Court of Special Appeals, Keiser presented the following questions for the appellate court's review:

I.     Did the suppression court err when it denied appellant's motion to suppress the two statements he made to the police because he was subject to "custodial interrogation" but not advised of his Miranda rights?

II.    Did the sentencing court err in not merging appellant's conviction for solicitation to commit first-degree assault into his conviction for solicitation to commit first-degree murder?

III.   Did the sentencing court's imposition of a life sentence for solicitation to commit first-degree murder constitute cruel and unusual punishment?

---

[2] The Court of Special Appeal's decision is discussed in more detail infra.

IV.    Did the trial court err in overruling appellant's motion for judgment of acquittal?

(Resp'ts.' Ans. Ex. 6 at 2, ECF No. 3-6).

The Court of Special Appeals vacated Keiser's sentence for solicitation to commit first-degree assault and merged that conviction with his conviction for solicitation to commit first-degree murder. (Id.). The appellate court affirmed the judgment in all other respects. (Id.). Keiser filed a petition for writ of certiorari with the Maryland Court of Appeals which was denied without opinion. (Resp'ts.' Ans. Ex. 7, ECF No. 3-7).

## C.    <u>Post-Conviction</u>[3]

On May 6, 2013, Keiser filed a post-conviction petition in the Circuit Court for Washington County. (Resp'ts.' Ans. Ex. 9 at 2, ECF No. 3-9). Keiser raised the following claims of ineffective assistance of trial counsel: (1) counsel failed to investigate, obtain, and introduce evidence of Keiser's poor financial condition to demonstrate he was unable to pay Smith $15,000.00; (2) counsel failed to introduce a letter from Keiser to his wife, dated December 28, 2009, regarding the blank check to his childhood friend, which would have demonstrated that Keiser needed the money for medication and Keiser was too intoxicated to recall making the statements to Whittington; (3) counsel disregarded the fact that Keiser's home was unalarmed in several locations and may not have been alarmed due to failure to pay; (4) counsel erred in impeaching Keiser with two prior convictions that were more than fifteen years old and one prior conviction that was then pending on appeal; (5) counsel erred in not

---

[3] The post-conviction court's decision is discussed in more detail <u>infra</u>.

requesting a limiting jury instruction directing the jury that Keiser's prior convictions could only be used to assess his credibility and could not be used as evidence of guilt; (6) counsel erred in failing to move to exclude the fact that Keiser was arrested for assaulting his wife; (7) counsel failed to request a limiting instruction directing the jury that Keiser's prior bad acts could only be considered in determining Keiser's motive and intent and not as evidence of his guilt; (8) counsel erred in permitting Keiser to wear prison clothing with DOC on the back during the trial; (9) counsel failed to require a jury instruction regarding the voluntariness of Keiser's statements to Whittington; (10) counsel erred in failing to object to and request a curative instruction regarding the State's opening and closing statements; (11) counsel failed to properly cross-examine Smith and otherwise introduce evidence of Smith's bias and motive to testify falsely; (12) counsel erred in failing to inspect and, if necessary, introduce Smith's notes that he had at trial that purported to describe his conversations with Keiser; (13) counsel erred in failing to investigate whether Smith had falsely accused other inmates; (14) counsel erred in ignoring Keiser's request to file a motion for a new trial; and (15) the cumulative errors of trial counsel constituted ineffective assistance of counsel. (Id. at 3–4). On June 3, 2015, the post-conviction court held a hearing on Keiser's petition. (Id. at 2). On July 30, 2015, the post-conviction court denied Keiser's petition. (Id. at 21).

In his application for leave to appeal the order denying post-conviction relief, Keiser raised two claims of ineffective assistance of counsel: whether trial counsel was ineffective for (1) introducing evidence of his prior convictions; and (2) failing to object to Keiser being tried in "prison clothes" with "DOC" written on the back. (Resp'ts.' Ans.

Ex. 10 at i, ECF No. 3-10). The Court of Special Appeals summarily denied Keiser's application for leave to appeal on December 8, 2016. (Resp'ts.' Ans. Ex. 12 at 1, ECF No. 3-12).

**D.    Habeas Claims in this Court**

On May 5, 2017, Keiser filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. (ECF No. 1). Respondents Warden Ricky Foxwell and Brian Frosh filed an Answer on July 10, 2017. (ECF No. 3). On August 2, 2017, Keiser filed a Reply. (ECF No. 4).

## II.    DISCUSSION

**A.    Standard of Review**

The Court may grant a petition for writ of habeas corpus only for violations of the U.S. Constitution or laws of the United States. 28 U.S.C. § 2254(a) (2018). The federal habeas statute, 28 U.S.C. § 2254 et seq., sets forth a "highly deferential standard for evaluating state-court rulings." Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997); see also Bell v. Cone, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions "the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (first quoting Harrington v. Richter, 562 U.S. 86, 102 (2011); and then quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)); see also White v Woodall, 572 U.S. 415, 419–20 (2014) (quoting Harrington, 562 U.S. at 103) (noting that a state prisoner must show that a state court ruling on a claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). A state court decision is contrary to clearly established federal law under § 2254(d)(1) where the state court: (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis of § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). In other words, "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id.</u> at 785 (quoting <u>Williams</u>, 529 U.S. at 365).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. <u>Id.</u> Put another way, a federal court may not issue a writ

"simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." Renico v. Lett, 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct." § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." Id. at 379.

## B.    Analysis

Keiser raises three grounds for federal habeas relief, all based on purported ineffective assistance of trial counsel—violations of the Sixth Amendment to the U.S. Constitution. First, Keiser contends that his trial counsel was ineffective for introducing evidence of his prior convictions. Second, Keiser argues that his trial counsel was ineffective for permitting him to be tried in prison clothes. Third, Keiser asserts that he was denied a fair trial based on the cumulative errors of trial counsel.

### 1.    Ineffective Assistance of Counsel Claims

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The second

prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A strong presumption of adequacy attaches to counsel's conduct. Id. at 696. This presumption is so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. Id..

A showing of prejudice requires that: (1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable; and (2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. See Strickland, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. A court need not make a determination regarding the attorney's performance if it is clear that no prejudice would have resulted had the attorney's performance been deficient. Id. at 697.

As the U.S. Supreme Court held in Strickland, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [§ 2254(e)(1)]."[4] 466 U.S. at 698. State court findings of fact made in the course of deciding an ineffectiveness claim, however, "are subject to

---

[4] This subsection was formerly codified at 28 U.S.C. § 2254(d).

the deference requirement of § 2254[(e)(1)]." Id. Both the performance and prejudice components of the ineffectiveness inquiry are "mixed questions of law and fact." Id.

The "unreasonable application" standard in § 2254(d)(1) applies to a state court's conclusion that a petitioner's trial counsel rendered effective assistance of counsel. Harrington, 562 U.S. at 105. "The standards created by Strickland and § 2254(d) are both "highly deferential." Id. (quoting Strickland, 466 U.S. at 689; and then quoting Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997). "[W]hen the two apply in tandem, review is 'doubly' so." Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). Because the Strickland standard is general, "the range of reasonable applications is substantial." Id. (citing Knowles, 556 U.S. at 123). The Supreme Court has cautioned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Id. Under § 2254(d), "the question is not whether counsel's actions were reasonable." Id. Rather, the inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The gravamen of Keiser's claim is that the state post-conviction court unreasonably applied Strickland in light of the record. Keiser argues that the post-conviction court applied Strickland in an objectively unreasonable manner by failing to conclude that trial counsel's errors prejudiced Keiser. The Court addresses Keiser's allegations of error in turn.

### a.    Admission of Keiser's prior convictions

During the post-conviction hearing, Creeden admitted that his introduction of three of Keiser's prior convictions, two older than fifteen years, and one which remained

on appeal, was error. (Resp'ts.' Ans. Ex. 8 at 86–88, ECF No. 3-8). Creeden explained that he spent a lot of time pretrial examining Keiser's and Smith's criminal records. (Id. at 87). He noted on Keiser's record that the two older convictions in question were "[t]oo old" to be used to impeach Keiser. (Id.). He explained that the trial was fast moving and that his "strategy and tactic" in questioning Keiser about his record was to "bring it out before the State does." (Id.). He admitted that it was a mistake to have elicited testimony on the two convictions that were older than fifteen years. (Id.). Creeden also agreed that it was error to introduce the conviction that was then on appeal. (Id. at 87–88).

The post-conviction court concluded that Keiser had not established that Creeden was ineffective with regard to this allegation of error. While the court agreed that Creeden erred in eliciting testimony on the three inadmissible convictions, it ultimately concluded that Keiser had failed to satisfy the prejudice prong of Strickland. (Resp'ts.' Ans. Ex. 9 at 9–10). In so holding, the court stated:

> The issue for this Court . . . is whether, under Strickland and Bowers [v. State, 578 A.2d 734 (1990)], the trial produced a just result, and whether there is a substantial or significant probability that the outcome of the trial would have been different without these errors. This Court is convinced that the State had a strong case against the Petitioner as Mr. Smith's knowledge of Mrs. Keiser and the Keiser home was so detailed that it could only have come from the Petitioner when he solicited Mr. Smith to murder Mrs. Keiser.
>
> As mentioned earlier, the State's case relied heavily on Mr. Smith's testimony concerning details regarding Mrs. Keiser and the Keiser's home, and Detective Alton's corroboration of these details. Mr. Smith testified at the criminal trial that the Petitioner had told him several details regarding Ms. Keiser and their home when he solicited Mr.

Smith. During the course of the solicitation, the Petitioner told Mr. Smith that Mrs. Keiser worked at Frederick Memorial Hospital; drove a Kia Sorento; was approximately five foot seven; had dirty blonde hair; was full figured and slightly overweight; the approximate area where their home was located; that there was a tractor parked in the back of their home; that their house had vinyl siding; that the home alarm override code was 'Romeo'; and that the override code referred to the name of [ ] their dog. Detective Alton also testified at the criminal trial that upon learning these details from Mr. Smith, he subsequently met with Mrs. Keiser and confirmed all of these details and confirmed that Mrs. Keiser had never met Mr. Smith. Based on this wealth of evidence, it cannot be said that the trial produced an unfair result, or that there is a significant probability that the outcome would have been different had the inadmissible convictions not been introduced. Therefore, the Petitioner cannot prove prejudice here and therefore he has failed to meet his burden of proof regarding this claim and the relief requested is denied.

(Id.) (footnote omitted).

Here, Keiser fails to demonstrate that the post-conviction court's application of Strickland was unreasonable. Nor does Keiser establish by clear and convincing evidence that the post-conviction court made an erroneous factual finding. While Keiser characterizes this case as close and centering on his credibility, the Court disagrees. A review of the record reveals that the case centered on the credibility of Smith, who Creeden heavily impeached during cross-examination. The post-conviction court properly found that in addition to Smith's testimony, Detective Alton was able to corroborate the information that Smith provided regarding Keiser's wife that Smith claimed Keiser told him when he solicited her murder. Those facts coupled with the threats Keiser made to Whittington about his wife demonstrated ample evidence of Keiser's guilt. In returning a verdict against Keiser, the jury rejected Keiser's explanation

for how Smith acquired the detailed information regarding his wife. There is nothing in the post-conviction court's decision that suggests it misapplied established federal law or improperly characterized the facts adduced at trial and at the post-conviction hearing in rejecting this claim. Thus, Keiser fails to present a viable claim for federal habeas relief on this basis.

### b.    Wearing of prison clothes during trial

During his testimony at the post-conviction hearing, Creeden agreed that he did not raise the issue of Keiser wearing a shirt that said DOC across the back and did not attempt to get Keiser out of the prison clothes. (Resp'ts.' Ans. Ex. 8 at 90–91). Creeden explained that Keiser was charged with asking someone in the Detention Center to harm his wife, so the jury would know that Keiser was in the Detention Center. (Id. at 91). Creeden testified that he did not believe that it "made a difference in the outcome" Keiser's case. (Id.). Creeden admitted saying to the judge that he did not believe Keiser's wearing of the prison clothes was "as prejudicial as it would be in some cases." (Id.).

In rejecting Keiser's ineffective assistance of counsel claim on the basis that Creeden failed to object to Keiser wearing prison clothes, the post-conviction court found that:

> . . . Mr. Creeden testified that he was aware of the issue, but recognized that the solicitation occurred while Mr. Keiser was incarcerated, that the crime occurred within a penal institution, and that the testimony would quickly present these facts to the jurors' attention. Furthermore, the mere fact that the Petitioner stood trial in prison clothing does not establish prejudice in light of the strength of the State's case. As stated above, prejudice exists if it is shown that, without the error, there was a substantial or significant possibility that the

outcome would have been different. Based on the strength of the State's case, there is not a significant possibility that the outcome of the case would have been different. The Petitioner has failed to meet his burden of proof regarding this claim and the relief requested is denied.

(Resp'ts.' Ans. Ex. 9 at 14).

Here, the post-conviction court's findings are supported by the record and do not constitute an unreasonable application of <u>Strickland</u>. When Keiser was called to testify and asked to identify himself, he offered that he was "in JCI-Jessup." (Resp'ts.' Ans. Ex. 3 at 151–52). The jury was aware of Keiser's incarceration both from his own testimony as well as the fact that the solicitation occurred at the Detention Center. When the trial court brought the issue to Creeden and Keiser's attention, Creeden explained that he was not concerned that Keiser's prison garb would prejudice him because the jury would learn that Keiser was incarcerated when the crimes occurred. (Resp'ts.' Ans. Ex. 3 at 8–9). Creeden reiterated this explanation when he testified at the post-conviction hearing. (Resp'ts.' Ans. Ex. 8 at 91).

As noted previously, while Keiser attempts to cast this case as solely turning on who was the more believable witness, Keiser or Smith, he ignores the other evidence introduced at trial including that: Keiser made two threatening statements concerning his desire to kill his wife in the presence of a law enforcement officer; had violated the domestic violence protective order on numerous occasions; at the time of the alleged solicitation was detained for an alleged second-degree assault on his wife; and that the facts known by Smith, who was heavily impeached during his testimony, were corroborated. The post-conviction court's determination that Keiser failed to demonstrate

prejudice as a result of Creeden's failure to object to his being tried in prison clothes is subject to a "highly deferential standard" and is to "be given the benefit of the doubt." <u>Renico</u>, 559 U.S. at 773. Nothing in the post-conviction court's decision indicates that its determination that Keiser failed to demonstrate prejudice as a result of his counsel allowing him to be tried in prison clothes was an unreasonable application of well-established law. <u>Harrington</u>, 562 U.S. at 101. Accordingly, the post-conviction court's conclusion is entitled to deference and the Court will not disturb it.

### 2. Cumulative Error Claim

Keiser contends that he is entitled to relief based on the cumulative errors of his trial counsel. Under the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." <u>United States v. Rivera</u>, 900 F.2d 1462, 1469 (10th Cir. 1990); <u>see also</u> <u>United States v. Basham</u>, 561 F.3d 302, 330 (4th Cir. 2009); <u>United States v. Martinez</u>, 277 F.3d 517, 532 (4th Cir. 2002).

Generally, if a court "determine[s] . . . that none of [a petitioner's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." <u>United States v. Fields</u>, 483 F.3d 313, 362 (8th Cir. 2007). To reverse for cumulative error, the errors must "so fatally infect the trial that they violated the trial's fundamental fairness." <u>Basham</u>, 561 F.3d at 330 (quoting <u>United States v. Bell</u>, 367 F.3d 452, 471 (5th Cir. 2004)). When "none of [the trial court's] individual rulings worked any cognizable harm [on the defendant], . . [i]t necessarily follows that the cumulative error doctrine finds no foothold." <u>United States v. Sampson</u>, 486 F.3d 13, 51

(1st Cir. 2007). In the U.S. Court of Appeals for the Fourth Circuit, the cumulative error doctrine is generally not recognized because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." Fisher v. Angelone, 163 F.3d 835, 852 n.9 (4th Cir. 1998); see also Arnold v. Evatt, 113 F.3d 1352, 1364 (4th Cir. 1997); Higgs v. United States, 711 F.Supp.2d 479, 552 (D.Md. 2010) (in the context of collateral review, review based on the cumulative effect of errors is available only where individual constitutional errors are found).

In rejecting Keiser's cumulative error claim, the post-conviction court held:

> Finally, the Petitioner argues that the cumulative effect of Mr. Creeden's errors prejudiced his defense. The Court of Appeals has held that, in determining whether the cumulative effect of performance by counsel constituted ineffective assistance, the touchstone, as always, is whether in view of all circumstances the confidence in the result has been undermined by counsel's failings. Although it is true that this Court finds that Mr. Creeden did commit an error during the course of the trial regarding the Petitioner's prior convictions, the error was immaterial, in light of the strength of the State's case that the Petitioner was not prejudiced. Here, the State's case against the Petitioner was strong and not simply a credibility battle between the Petitioner and Mr. Smith. Instead, as the State correctly opined, this was a corroboration case in which Mr. Smith's testimony was independently corroborated by Detective Alton and Mrs. Keiser. As such, the Petitioner has failed to meet his burden of proof regarding this claim and the relief requested is denied.

(Resp'ts.' Ans. Ex. 9 at 19–20) (footnote omitted).

Here, because Keiser fails to establish that each of the errors discussed above warrant granting his Petition, Keiser's cumulative error claim provides no grounds for federal habeas corpus relief. Fields, 483 F.3d at 362.

Even if the Court were to determine that trial counsel's errors prejudiced Keiser, he would still not be entitled to relief in this Court. "The pivotal question [in a § 2254 petition] is whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. "This is different from asking whether defense counsel's performance fell below Strickland's standard." Id. In this case, there is simply no indication that the post-conviction court's determination "was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." Id. at 103. As noted above, the post-conviction court identified the appropriate federal law as established by the Supreme Court for determining ineffective assistance of counsel claims and applied it in a manner that was not contrary or unreasonable to Supreme Court precedent. In light of the record, there is no basis for the Court to conclude that the post-conviction court's determinations were unreasonable on the facts or on the law. The Court, therefore, concludes that there is no cause to disturb the post-conviction court's decision under § 2254(d).

In sum, having examined the post-conviction court's rulings and independently examined the record, the Court is satisfied that the post-conviction court's application of the Strickland standard to trial counsel's allegedly deficient performance was not unreasonable. Accordingly, the Court will deny Keiser's Petition.

## C.  **Certificate of Appealability**

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Buck v. Davis, 137 S.Ct. 759, 773 (2017). The petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented are adequate to deserve encouragement to proceed further," Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Because the Court concludes that Keiser has not made a substantial showing of the denial of a constitutional right, the Court will decline to issue a certificate of appealability. See 28 U. S.C.§ 2253(c)(2). Keiser may still request that the Fourth Circuit issue such a certificate. See Lyons v. Lee, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

## III.  CONCLUSION

For the foregoing reasons, the Court will deny Keiser's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1). The Court will also decline to issue a certificate of appealability. A separate Order follows.


December 18, 2018 \
Date

        /s/ \
        George L. Russell, III \
        United States District Judge